**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES R. MALLIN,** | : | **Case No. 1:09-CV-00223** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| **CITY OF EASTLAKE,** *et al.***,** | : | **MEMORANDUM & ORDER** |
| | : | |
| **Defendants.** | : | |

Before the Court is Defendants' *Motion for Summary Judgment and for Dismissal of State Law*

*Claims.*  (Doc. 26.)  This Motion is **GRANTED IN PART AND DENIED IN PART**.  As explained

more fully below, the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN**

**PART** as to Defendant Tim Thompson, **GRANTED** as to Robert Gonzales, and **GRANTED** as to the

City of Eastlake (the "City").  The Defendants' Motion for Dismissal of State Law Claims is **DENIED**

as to Thompson and the City but is **GRANTED** as to Gonzales.  The Court **ORDERS** Mallin to show

cause within 14 days as to why summary judgement should not be granted in favor of the City on the

issue of state law immunity.  If Mallin fails to timely show cause, summary judgement shall be

**GRANTED** in favor of the City on this issue.

I.      **BACKGROUND**

This lawsuit arises under 18 U.S.C. § 1983 as well as state law.  The gravamen of the complaint

1

is straightforward: the Plaintiff, James Mallin ("Mallin"), alleges that the Defendants, City of Eastlake police officers Tim Thompson and Robert Gonzales (the "Officers"), violated his "basic constitutional rights" by using excessive force.  (Doc. 2-2 ("Compl.") at ¶¶ 2-6.)  Mallin alleges that the defendants used excessive force on four separate occasions: first, while arresting Mallin on February 2, 2008; twice more during Mallin's pretrial detention; and a fourth time, while arresting Mallin on February 16, 2008.

Based on these events, Mallin has asserted the following causes of action: (1) excessive force claims under 42 U.S.C. § 1983 against the Officers; (2) a claim under 42 U.S.C § 1983 against the City for maintaining a policy or practice approving of the Officers' use of excessive force; (3) state law claims for intentional infliction of emotional distress against the Officers and the City; and (4) state law claims of assault and battery against the Officers.  (Compl. at ¶¶ 5-18.)

The Officers have filed a joint motion for summary judgment and for dismissal of Mallin's Ohio law claims.  They also argue that they are entitled to qualified immunity from Mallin's § 1983 claim as a matter of law because they acted in an objectively reasonable manner while arresting Mallin and during Mallin's pretrial detention. (Doc. 27 ("Defendants' SJ Brief") at 25.)  The City argues that it too is entitled to summary judgment because Mallin has failed to identify a specific policy or practice that was the "moving force" of the alleged constitutional violation, as required by *Monell v. Department of Social Services*, 436 U.S. 658, 694.  (*Id*. at 21.)  The Defendants have also moved for the discretionary dismissal of Mallin's state law claims in the event that summary judgment is entered in the Defendants' favor with respect to Mallin's federal claims.  (*Id*. at 23.)

## II.     THE EVENTS GIVING RISE TO THE CURRENT DISPUTE

### A. Thompson's Use of Excessive Force While Arresting Mallin on February 2, 2008

The events leading to this litigation began on the evening of February 2, 2008, when Officers

Timothy Thompson and Mike Werner were dispatched to the Hideaway Bar[1] in Eastlake, Ohio to respond to a domestic disturbance complaint.  (*See* Doc. 27-2 at 1, 5.)  Dispatch informed Thompson and Werner that Faith Fragozo, Mallin's sister, had reported that Mallin was assaulting his mother.  (*Id.* at 5.)  Upon arrival, Thompson and Werner found Mallin and his mother inside a van.  (*Id.*)  Thompson observed Mallin flailing his arms, and, unable to tell whether the Plaintiff was assaulting his mother or merely gesturing, Thompson approached Mallin's side of the van and opened the door.  (*Id.*; *see also* Doc. 30 ("Theresa Mallin Dep. Pt. 1") at 62:18-21.)

The parties dispute what happened next.  Thompson claims that he told Mallin to exit the van and Mallin complied.  (Doc. 27-2 at 5; *see also* Theresa Mallin Dep. Pt. 1 at 64:4-21.)  Though Thompson testified that Mallin appeared agitated and intoxicated, it is undisputed that Mallin further complied when Thompson instructed him to stand by a police cruiser and to put his hands behind his back to be handcuffed.  (Doc. 27-2 at 2, 5.)  Officers Thompson and Werner both testified that Thompson handcuffed Mallin and placed him in Officer Werner's police cruiser without using any force.  (*Id.* at 2; Doc. 27-4 ("Werner Afft.") at 2.)

In stark contrast to the officers' accounts, Mallin claims that Thompson never told him to step out of the van.  (Doc. 28 ("Mallin Dep. Pt. 1") at 60:10-15.)  Instead, Mallin testified, Thompson grabbed Mallin by his shirt and dragged him out of the van, to the back of a police car. (*Id.* at 60:19, 64:14-20.)  There, Mallin claims, Thompson grabbed him by the shoulders, slammed his face against the trunk of the car, (*Id.* at 64:14; 65:4; 78:2-5), and applied a "choke hold" as he placed Mallin in

---

[1]While this establishment is referred to by various names in the record, the Court will use "Hideaway Bar" for consistency.

handcuffs.  (*Id*. at 73:18-25; 74:1-7.)[2]

### B. Thompson's Use of Excessive Force During Mallin's Booking on February 2, 2008

Following Mallin's arrest, Officer Werner drove Mallin to the Eastlake Police Department (the "Department"), where he and Sgt. Mike Malone began Mallin's booking process.[3]  (Doc. 27-4 at 2.) Mallin's mother followed Thompson back to the Department to complete a statement.  (Doc. 27-2 at 2.)  At some point during Mallin's booking process, he called his mother's cell phone from the Department booking room "to see what was going on."  (Mallin Dep. Pt. 1 at 66:12-13.)  Here, the parties' accounts again diverge.  Mallin claims that the booking room doors flew open as Thompson ran up to him and asked whether Mallin liked "beating up on old ladies."  (*Id*. at 66:13-16.)  Then, Mallin testified, Thompson punched him in the side of the head, sending Mallin's cell phone flying.[4] (*Id*. at 66:16-17.)  According to Mallin, the next thing he remembers is waking up in a jail cell.[5]  (*Id*. at 66:17-18.)

In contrast, Officers Thompson, Werner, and Maloney all testified that Thompson never even entered the booking room.  (Doc. 27-2 at 2; Werner Afft. at 2; Doc. 27-5 ("Maloney Afft.") at 2.)  When

---

[2]Mallin's mother testified that Thompson directed Mallin out of the van, and he complied; she says that she did not see any other portion of the interaction between Mallin and Thompson that evening.  (Theresa Mallin Dep. Pt. 1 at 64:25-65:3.)

[3]The Plaintiff has no recollection of riding to the Eastlake Police Department.  (*Id*. at 66:6-11.)  The next thing he remembers after being placed in the police car is waking up in the Department's booking room.  (*Id*. at 66:10-11.)

[4]In a later part of his deposition, Mallin contradicted this assertion, claiming that Officer Thompson "grabbed the phone out of [his] hand."  (Doc. 29 ("Mallin Dep. Pt. 2") at 68:7.)

[5]Mallin apparently has some recollection of being led to his cell because later in his deposition, he described how he was led from the booking room to his cell.  (Mallin Dep. Pt. 2 at 68:12-25.)

Mallin called his mother, Thompson was in the Department's interview room, helping Mallin's mother write out her statement.  (*Id*.)  Once Thompson learned that it was Mallin who had called, Thompson claims that he "walked towards the jail area," entered the "Turn Key" area,[6] and yelled to Maloney and Werner that Mallin was on the jail booking phone.[7]  (*Id*.)  According to Thompson, Werner, and Maloney, Thompson then yelled at Mallin to get off of the phone before turning around and waking back towards the interview room.  (*Id*.; Werner Afft. at 2; Maloney Afft. at 2.)  The officers all testified that "[a]t no time" did Thompson "cross the threshold of the Turn Key and enter the Booking Room." (Doc. 27-2 at 2; Werner Afft. at 2; Maloney Afft. at 2.)  Instead, they claim, Maloney approached Mallin, which they believe caused him to hang up the jail booking phone.  (Werner Afft. at 2; Maloney Afft. at 2.)  Werner and Maloney then escorted Mallin to Cell #4 of the Eastlake Jail.  (*Id*.)  Mallin was in his cell by no later than 10:40 P.M.  (*Id*.)  Thompson, Werner, and Maloney each testified that their shifts ended at 12:00 A.M. on February 3, 2008 and that they left shortly thereafter.  (Doc 27-2 at 3; Werner Afft. at 3; Maloney Afft. at 2.)

### C. The Officers' Use of Excessive Force in Mallin's Cell on February 3, 2008

Officer Robert Gonzales testified that he was not on duty on February 2, 2008 and that his

---

[6]The Turn Key area is adjacent to the booking room.  (*See* Doc. 29-19 ("Eastlake Police Department Floor Plan") at 1.)

[7]Contrary to Mallin's account, Thompson claims that Mallin did not even have a cell phone with him at the time and therefore must have called his mother from the booking room phone.  (*See* Defendants' SJ Brief at 22.)  While no officer claims to have seen Mallin using the booking room phone, Officers Werner and Maloney both testified that they "specifically recall that Mr. Mallin did not have a cell phone in his possession at any time he was at the Eastlake Police Department." (Werner Afft. at 3; Maloney Afft. at 2.)  The Booking System Inmates Property form completed by the officers similarly indicates that other than Mallin's clothing, his only personal items were glasses, an earing, and a necklace. (Doc. 27-4 at 6.)

5

February 3rd shift began at 12:00 A.M at the Eastlake Police Department jail.[8]  (Doc. 27-3 ("Gonzales Afft.") at 1.)  At the start of his shift, Gonzales checked on Mallin and the only other prisoner at the jail. (*Id*. at 2.)  He observed nothing unusual.  (*Id*.)  At 12:05 A.M., while Gonzales was still at the Department, he received a radio dispatch to report to the jail area because Mallin was attempting to hang himself.  (*Id*.)  Officer Gonzales arrived at Mallin's cell within a minute, along with Officers Greer, Formick, Cronin, and McCauley.  (*Id*.)  The parties dispute what occurred next.  According to Gonzales, the officers untied Mallin from his makeshift noose using "minimal physical force."  (*Id*.) Gonzales claims to have used "no physical force" thereafter.  (*Id*.)  Based on Gonzales's observation that Mr. Mallin had "made a very half-hearted and weak attempt to hang himself" and was not injured, and after speaking with Mr. Mallin, Gonzales testified, he determined that Mallin did not need to be transported to the hospital for further evaluation.  (*Id*.)  Then, Gonzales claims, to prevent Mallin from attempting to harm himself again–and in accordance with Jail Medical Policy–Gonzales asked Mallin to remove all of his clothing except for his underwear, which Mallin did without incident.  (*Id*.)

Mallin tells a different account of what transpired in his cell.  According to Mallin, Gonzales placed his foot on Mallin's neck and throat as he stripped off Mallin's clothes.  (*Id*. at 16:13-17; 17:19-21.)  Mallin also claims that officers had their feet on Mallin's neck, shoulders, and other parts of his body, but it is not clear which officers Mallin is referring to.  (*Id*. at 16:6-8 ("He held me down when they took my cloth [sic] off. *They* had their foot [sic] against my neck and my shoulders and everything else.") (emphasis added).  Mallin further testified that Thompson–who claims to have already left the

---

[8]Mallin disputes this, claiming in his deposition that Officer Gonzales was on the scene when Mallin was arrested on February 2nd.  (Mallin Dep. Pt. 1 62:5-9; Compl. at ¶ 2.)  The Eastlake Police Department Daily Report, however, indicates that, on February 2nd, Gonzales was absent, having taken a vacation day.  (Doc. 27-1 at 49.)

station at this point–held Mallin down and took off his shirt.  (*Id*. at 17:24-25.)  Though Mallin does not dispute that the officers left him in only his underwear, he claims that his clothing was returned the next morning only after he confessed to theft of a credit card.  (Mallin Dep. Pt. 2 at 3:1-5.)

**D. Thompson's Use of Excessive Force While Arresting Mallin on February 16, 2008**

On February 4, 2008, the Monday following Mallin's arrest, Mallin's mother sought a temporary protective order, which was granted by Judge Allen of the Willoughby Municipal Court.  (Doc. 32 ("Faith Fragozo Dep.") at 34:23-25, 37:11-13; Doc. 31 ("Theresa Mallin Dep. Pt. 2") at 15:24-16:15.) Later that day, Mallin was transferred to the Lake County Jail.  (Faith Fragozo Dep. at 44:24-45:2.)  On February 13, 2008, Mallin was released from the Lake County Jail.[9]  (Faith Fragozo Dep. at 59:11-17; 71:12-14.)  Because the temporary protective order prevented Mallin from staying with his mother, he stayed with his sister, Faith.  (Theresa Mallin Dep. Pt. 2 at 16:20-21.)

At approximately 3:30 A.M. on February 16, 2008, Mallin attempted to visit his mother's apartment, in violation of the temporary protective order.  (Mallin Dep. Pt. 2 at 4:9-15.)  When Mallin's mother would not answer her apartment door, Mallin called the police to have her arrested.[10]  (Doc. 31-6 at 1.)  Officer Gonzales arrived at the apartment shortly thereafter.  (Mallin Dep. Pt. 2 at 7:8-11.) Instead of arresting Mallin for violating the protective order, Gonzales dropped Mallin off near Faith's house.  (*Id*. at 8:15-16.)  Faith picked Mallin up shortly thereafter and brought him back to her home. (Faith Fragozo Dep. at 72:14-17.)

---

[9]While Mallin's mother testified that she believes that her son was released on a Tuesday, which would have been February 12, 2008 (Theresa Mallin Dep. Pt. 2 at 16:16-19), the exact date of Mallin's release is not relevant to the outcome of this Motion.

[10]Mallin told dispatch that his mother had called, asking him to come to her apartment.  (*See* Doc. 31-6 at 1.)  It appears that Mallin erroneously believed that, by contacting him, his mother had somehow violated the protective order that was intended to safeguard her.

Later that day, at approximately 1:00 P.M., Officers Thompson and Roberts went to Faith's house to arrest Mallin for violating the protective order.  (Doc. 27-2 at 3, 14.)  Joe Fragozo, Faith's husband, let the officers in.  (*Id*. at 3; Doc. 33 ("Joe Fragozo Dep.") at 17:1-3.)  Thompson found Mallin sleeping in an upstairs bedroom, where he claims to have awakened Mallin using "verbal commands" and "a slight shake of [Mallin's] shoulder."  (Doc. 27-2 at 3.)  Then, Thompson testified, he had Mallin go downstairs to finish getting dressed.  (*Id*.)  Because Mallin was putting on his shoes "very slowly," Thompson claims that he picked Mallin up from a couch by placing his right hand under Mallin's left armpit.  (*Id*.)  According to Thompson, he then walked Mallin out to his police cruiser, handcuffed Mallin without incident, and transported him to the Eastlake Police Department.  (*Id*.)

Mallin's account of his arrest differs sharply.  Mallin claims that he was asleep at his sister's house when the door came "flying open" and Thompson greeted him with: "good morning, Mr. Mallin, it's time to get up."  (Mallin Dep. Pt. 2 at 9:17-19.)  Then, Mallin claims, Thompson grabbed him by the neck and pulled him out of bed.  (*Id*. at 10:12-20.)  Because he was awakened from a "dead sleep," Mallin cannot recall precisely how long Thompson applied pressure to his neck, though he claims that he went from prone to standing immediately.  (*Id*. at 11:1-7.)  Mallin concedes, however, that Thompson applied no downward pressure on his throat.  (*Id*. at 11:8-14.)  Mallin also disputes Thompson's version of what occurred downstairs.  While Thompson testified that he picked Mallin up from under his armpit, Mallin claims that Thompson picked him up by his shoulders, aggravating injuries which Mallin claims to have sustained while incarcerated at the Eastlake Police Department following his first arrest.  (*Id*. at 14:14-20.)[11]

_____

[11]Mallin offers no other evidence of what occurred in his sister's home, despite the presence of Joe Fragozo and Officer Roberts in the home.  Thompson, on the other hand, offers Mr. Fragozo's deposition testimony in support of his argument that he did *not* use excessive force in

Mallin later plead guilty to violating the temporary protective order, among other charges. (Mallin Dep. Pt. 1 at 25:6-12.)  He was incarcerated until some point in May of 2008, after which he entered NEOCAP[12], a residential substance abuse treatment facility.  (Faith Fragozo Dep. at 107.) Mallin was released from NEOCAP sometime in August or September of 2008 (Theresa Mallin Dep. Pt. 2 at 52:2-5) and subsequently filed this lawsuit.

## III.    STANDARD OF REVIEW

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Anderson*, 398 U.S. at 252.

---

dealing with Mallin downstairs.  (*See* Defendants' SJ Brief at 20) (*citing* Joe Fragozo Dep. at 28) (opining that, while Thompson "could have been a little more...gentle with" Mallin, and that the way Thompson picked Mallin up "wasn't nice," the maneuver was not "police brutality.")

[12]The full name of this program is the North East Ohio Community Alternative Program.

9

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citation omitted); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989). The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted). In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (citation omitted). Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (emphasis in original) (internal quotations omitted)).

**III.     REQUIREMENTS FOR ESTABLISHING LIABILITY UNDER § 1983**

Mallin's federal claims arise under 42 U.S.C. § 1983, which requires a plaintiff to "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citations omitted).  The Defendants in this action do not dispute that they acted under color of state law during any of the relevant events.  Accordingly, the question simply is whether Mallin suffered a depravation "of a right secured by the Constitution or laws of the United States." *Id*.  With respect to that question, it is important to acknowledge that many unfair, unwise, or imprudent actions are not necessarily constitutionally unreasonable.  *See Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)*.*  Law enforcement officials are allowed "latitude for honest mistakes," even when those mistakes are difficult to understand with the benefit of hindsight.  *See Maryland v. Garrison*, 480 U.S. 79, 87 (1987) Nevertheless, each and every citizen has meaningful constitutional rights that law enforcement officials may not violate.  *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004).

If Mallin can show such a violation, he then must establish the propriety of recovery from any particular party.  *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007).  Although

this analysis begins with the familiar requirement that a specific defendant proximately caused the constitutional deprivation, establishing proximate cause within the context of § 1983 is sometimes quite "murky."  *Wright v. City of Canton*, 138 F. Supp. 2d 955, 965 (N.D. Ohio 2001).  Even when an individual law enforcement official has proximately caused the deprivation of a constitutional right, moreover, that official will not be held liable unless that right was "clearly established," and that official has caused the deprivation in an "objectively unreasonable manner."  *See Champion*, 380 F.3d at 901.  The Court begins its analysis by discussing the distinct requirements for individual and municipal liability.

### A. Individual Liability

While lawsuits under § 1983 frequently provide "the only realistic avenue for vindication of constitutional guarantees," those lawsuits also impose a very substantial cost on society, "including 'the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.'"  *Champion*, 380 F.3d at 901 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).  It has long been recognized, moreover, that officials cannot perform their jobs safely or effectively if their every split-second decision is analyzed with knowledge gained only through hindsight.  *See Kostrzewa*, 247 F.3d at 639 (citing *Graham v. Connor*, 490 U.S. 386 (1989)).  Actions taken by law enforcement officials that appear unreasonable to a court weighing those actions over a period of months were not necessarily unreasonable when made in a matter of seconds under life-threatening pressure.  *See id*.  The doctrine of qualified immunity provides a balance: it holds that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Champion*, 380 F.3d at 901.

12

Thus, when a police officer invokes qualified immunity, the burden is on the plaintiff to demonstrate that the officer is *not* immune.  *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-prong test for evaluating qualified immunity claims.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  Second, "if a violation could be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether the right was clearly established."  *Id.*  A motion for summary judgment on qualified immunity grounds must be granted unless the plaintiff can satisfy both prongs of the *Saucier* test.[13]  *See Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).  A court, moreover, is not required to address the first question if it is evident that, even if a right was violated, that right was not clearly established at the time of the violation.  *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound

---

[13] Various panels of the Sixth Circuit have broken the two-prong Saucier test for qualified immunity into three-prongs:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Champion*, 380 F.3d at 901 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).  The first two prongs of this test, of course, mirror the two prongs of *Saucier*.  The third prong explicitly examines the reasonableness requirement that other courts find implicit in *Saucier*.  *See Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005).  Some Sixth Circuit panels have held, however, that the three-prong approach is unnecessary in most cases, because "[i]n many factual contexts . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." *Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006).

This Court believes the two-prong approach to be particularly appropriate in cases, such as this one, in which neither party analyzed the third prong in briefing.

13

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

In this context, the Supreme Court and the Sixth Circuit have rejected the contention that a right is only clearly established if the plaintiff can demonstrate the existence of a "fundamentally similar" or "materially similar" case.  *Grawey v. Drury*, 567 F.3d 302, 313-314 (6th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  They have explained:

> the question is whether the defendants had fair warning that their actions were unconstitutional.  Thus, officials can still be on notice that their conduct violates established law even in novel factual circumstances.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* (citations and quotation markings omitted); *see also Champion*, 380 F.3d at 902 ("[T]he fact that various courts have 'not agreed on one verbal formulation of the controlling standard' does not by itself entitle an officer to qualified immunity." (quoting *Saucier*, 533 U.S. at 203)).  Because the focus is on whether the officer had fair notice that his conduct was lawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  *Champion*, 380 F.3d at 902.

### B. Municipal Liability

When plaintiffs seek to recover from a municipality, there is no requirement that a particular right be "clearly established," but the plaintiffs must show that the municipality itself was the proximate cause of any deprivation.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992); *Ford v. County of Grand Traverse*, 535 F.3d 483, 495-96 (6th Cir. 2008).  There is no vicarious liability under § 1983 for the alleged torts of a municipality's agents, rather:

> It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.

14

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") (citation omitted).  Simply put, to impose § 1983 liability upon a local government body, a plaintiff must show that the municipality itself is the wrongdoer.  *Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992).

A plaintiff can establish that a municipal defendant proximately caused a violation under any of five theories: (1) express municipal policy, *Monell*, 436 U.S. at 660-61; (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnick*, 485 U.S. 112, 127 (1988) (quotation omitted); (3) the decision of a person with final policy making authority, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986); (4) the failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]," *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)[14]; or (5) ratification by a municipality of its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct, *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995); *see also Leach*

---

[14] This category includes deliberately indifferent training or supervision, *Canton*, 489 U.S. at 390; *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006), deliberately indifferent hiring, *Brown*, 520 U.S. at 410-11; *see also Doe v. Magoffin County Fiscal Court*, 174 Fed. Appx. 962, 967 (6th Cir. 2006), and deliberately indifferent failure to adopt policies necessary to prevent constitutional violations, *Conn v. City of Reno*, 572 F.3d 1047, 1064 (9th Cir. 2009); *see also Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992).

*v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *Wright*, 138 F. Supp. 2d at 966 ("[Plaintiff] can establish his municipal liability claim by showing . . . [that] a final municipal policymaker approved an investigation . . . that was so inadequate as to constitute a ratification of their alleged use of excessive force.").

## V.      WHETHER OFFICERS THOMPSON AND GONZALES ARE ENTITLED TO QUALIFIED IMMUNITY FROM MALLIN'S § 1983 CLAIMS AS A MATTER OF LAW

Mallin claims that the Officers used excessive force in violation of § 1983 on four separate occasions: (1) on February 2, 2008 during his arrest (Compl. at ¶ 2); (2) when Thompson punched Mallin in the head in the booking room (*Id*. at ¶ 2; Mallin Dep. Pt. 1 at 66:16-17) ; (3) on February 3, 2008 in Mallin's cell (Compl. at ¶ 3; Mallin Dep. Pt. 2 at 16:5-17, 17:24-25); and (4) on February 16, 2008, when he was arrested at his sister's house. (Compl. at ¶ 4.)  Section 1983 does not itself confer any substantive rights; it merely provides an avenue to vindicate rights conferred by the Constitution or federal statute.  *Aldini v. Bodine*, 609 F.3d 858, 864 (6th Cir. 2010).

Thus, analysis of excessive force claims brought under § 1983 "begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham*, 490 U.S. at 394.  It is well established that the Officers' alleged use of excessive force while arresting Mallin falls within the Fourth Amendment's prohibition against unreasonable seizures of the person.  *See id.* at 395 ("[A]ll claims that law enforcement officers have used excessive force...in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment.").  With respect to Mallin's claims arising from his pretrial detention at the Eastlake Police Department, the Supreme Court's guidance is less clear.  *See Aldini*, 609 F.3d at 864 ("The Supreme Court has deliberately left undecided the question of whether the Fourth Amendment

16

continues to provide protection against deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins.") (citations omitted). The Sixth Circuit, however, recently addressed this issue in *Aldini*, holding that, where a suspect is arrested without a warrant, the Fourth Amendment's protection applies until after an arrestee's probable-cause hearing. *Id*. Because Mallin was arrested without a warrant,[15] and the alleged use of excessive force at the Department occurred prior to Mallin's probable-cause hearing, the claims arising from Mallin's pretrial detention must also be analyzed under the Fourth Amendment.

Claims that the government used excessive force in violation of the Fourth Amendment are analyzed under the "objective reasonableness" standard set forth in *Graham*:

> Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.

*Id.* at 396. Application of this test "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."[16] *Id.* Further, the "reasonableness" of a particular use of force is objective and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation," *Graham*, 490 U.S. at 396, 397. Indeed, it is

---

[15]While there was apparently an outstanding arrest warrant for Mallin for grand theft (Mallin Dep. Pt. 1 at 74:21-75:1), in his Incident Report, Thompson stated that Mallin was arrested "for the domestic violence incident," (Doc. 27-2 at 6) not for the outstanding warrant.

[16] *See St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (noting that reviewing courts should consider the three factors identified in *Graham* when evaluating excessive force claims, but also recognizing that those factors "did not constitute an exhaustive list").

17

not for the Court to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Thus, the Officers are entitled to qualified immunity from the § 1983 claims unless Mallin shows that: (1) viewing the evidence in the light most favorable to him, his Fourth Amendment rights were violated, as determined by *Graham*'s "objective reasonableness" standard; and (2) that right was clearly established at the time of the violation. *See Chappell*, 585 F.3d at 907.

### A. Thompson's Use of Excessive Force While Arresting Mallin on February 2, 2008

Mallin first claims that Thompson violated his clearly established Fourth Amendment rights by using excessive force to arrest Mallin on February 2, 2008. (Compl. at ¶ 2.) In assessing this claim, all of the facts in the record must be construed in the light most favorable to Mallin, after which "the question of whether [the Officers'] actions were objectively unreasonable is a pure question of law." *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (citations omitted).

Mallin asserts that, without asking Mallin to exit his mother's van, Thompson grabbed Mallin by the coat, pulled him out of the van, and dragged Mallin from the van to a police car. (Mallin Dep. Pt. 1 at 63:23-64:7.) Then, Mallin testified, Thompson slammed Mallin's face against the trunk of the car. (*Id*. at 64:12-14.) Afterwards, Mallin claims, Thompson applied a choke hold[17] as he placed Mallin

---

[17]While Mallin claims that Thompson put him in a "choke hold," Mallin's deposition testimony reveals that Thompson was not actually using the police technique known as a "choke hold," also called a "carotid hold." As explained by the Supreme Court:

In the 'carotid' hold, an officer positioned behind a subject places one arm around

18

in handcuffs.  (*Id*. at 74:5-7.)

### 1. Fourth Amendment Violation

Claims that a police officer used excessive force during an arrest are analyzed under the Fourth Amendment objective reasonableness standard.[18]   Central to this inquiry is "whether the law enforcement officer had a legitimate government interest, i.e., justification, to exert force." *Morrison v. Bd. of Trs.*, 583 F.3d 394, 404 (6th Cir. 2009); *Bultema v. Benzie County*, 146 Fed. Appx. 28, 37 (6th Cir. 2005).  As the Sixth Circuit has explained, a "police officer's use of force against a suspect is justified by the threat posed by the suspect to the safety of the officer or others."  Accordingly, once a suspect has "already been *restrained*, the officer's constitutional authority to use force is significantly more circumscribed." *Id*.

Officer Thompson argues that Mallin's allegations cannot establish a Fourth Amendment violation as a matter of law because: (1) Thompson's actions were justified under the circumstances; and (2) the record contains insufficient evidence of Mallin's alleged injuries.  Neither of these arguments are persuasive.

---

the subject's neck and holds the wrist of that arm with his other hand. The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. The 'carotid' hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain.

*City of Los Angeles v. Lyons,* 461 U.S. 95, 98 n.1 (1983).  Because Thompson's right arm was on Mallin's arm (Mallin Dep. Pt. 1 at 74:10-11), rather than interlocked with Thompson's left arm to complete a carotid choke, the Court will refer to Thompson's maneuver by the generic term "choke" rather than the term of art "choke hold." *See Turner v. Viviano*, 2005 U.S. Dist. LEXIS 35119, at *29-31.

19

### *a. Justification*

First, Thompson argues that the government interest in maintaining safety and control outweighed Mallin's interest in avoiding force, even if the Court assumes, as it must, that Thompson dragged Mallin from the van, slammed his face against the police car, and choked Mallin. Specifically, Thompson claims that everything that the officers had observed about Mallin "to that point indicated [that] he was out of control." (Defendants' SJ Brief at 14.)  Thompson adds that there was no way to know whether Mallin would attempt to escape and that Mallin posed a threat to both his mother and the public.  Thompson concludes that because "[t]here can be no finding of malice" under the circumstances, he is entitled to qualified immunity. (*Id*. at 15.)

As an initial matter, the objective reasonableness standard contains no malice requirement. Indeed, the Supreme Court expressly held in *Graham* that the officer's "underlying intent or motivation" are irrelevant.[19] 490 U.S. at 397.  Moreover, as discussed below, Thompson's justifications are largely contradicted by the record.  At the very least, when viewing the facts in the light most favorable to Mallin, there are genuine issues of material fact regarding whether the force used by Thompson was excessive.

With respect to the first *Graham* factor, the severity of the suspect's crime, Mallin was suspected of committing domestic violence against his elderly mother.  (Doc. 27-2 at 2, 7.)  This factor favors Thompson because, unlike in the case of a non-violent crime, a reasonable officer could believe that

---

[19]Though malice was once one of four factors of the Sixth Circuit's test for cases involving the use of non-deadly force, *see McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988), that test was supplanted by *Graham*'s objective reasonableness standard.  *See Graham*, 490 U.S. at 397 (holding that the four-factor test "which requires consideration of whether the individual officers acted in 'good faith' or 'maliciously and sadistically for the very purpose of causing harm,' is incompatible with a proper Fourth Amendment analysis.") (citation omitted).  Unfortunately, in applying the incorrect standard, (*see* Doc. 27 at 15), Thompson's brief fails to offer much meaningful analysis with respect to this issue.

Case: 1:09-cv-00223-BYP  Doc #: 42  Filed:  09/29/10  21 of 43.  PageID #: 848


additional force is warranted to immediately stop Mallin from further harming his mother.  Though Mallin's mother later claimed that Mallin "never, ever hit" her (Theresa Mallin Dep. Pt. 1 at 60:5.), Officer Thompson observed Mallin flailing his arms while inside the van with his mother.  This observation, combined with the dispatcher's report of domestic violence, would justify a split-second judgment by Thompson to drag Mallin out of the car and away from his mother.  As discussed below, however, this factor does not justify Thompson's alleged subsequent actions because, when viewed in the light most favorable to Mallin, the facts show that Mallin no longer posed a risk to his mother–or others–when Thompson allegedly slammed Mallin's head and choked Mallin.

The second factor, whether Mallin posed an immediate threat to the officers or others, favors Mallin, at least given the constraint posed by the Court's obligation to take Mallin's description of the facts as true.[20]  As noted above, a reasonable officer may have initially determined that Mallin posed a threat to his mother, and potentially, to others.  Once Thompson pulled Mallin out of the van and away from his mother, however, a reasonable jury could conclude that the threat dissipated.  Indeed, contrary to Thompson's argument that "everything [the officers] had observed" prior to handcuffing Mallin "indicated that he was out of control," (Defendants' SJ Brief at 14), Thompson, in his own affidavit, testified that Mallin was "compliant" both when asked to stand by a police cruiser and to put his hands behind his back to be handcuffed.  (Doc. 27-2 at 2.)  Mallin testified, moreover, that Officer Thompson had his hands on Mallin's coat and shirt as Thompson dragged Mallin from the van to the rear of Werner's police cruiser.  (Mallin Dep. Pt. 1 at 64:3-7.)  That Mallin "was not handcuffed at the time he was struck does not preclude a finding of unreasonableness." *Baker v. City of Hamilton*, 471 F.3d

---

[20]Because Mallin is the non-movant, the Court's analysis adopts Mallin's version of the facts, and draws all justifiable inferences in his favor, to the extent that it is not "blatantly contradicted by the record." *See Scott v. Harris*, 550 U.S. 372, 381 (2007); *Anderson*, 477 U.S. at 255.

601, 607 (6th Cir. 2006) (holding that despite the suspect's attempt to flee, a jury could find it objectively unreasonable to strike the suspect's head with a police baton once he surrendered).  There is no evidence suggesting that Mallin attempted to break free, nor did he threaten his mother, the officers, or a third party.  Furthermore, while Thompson had Mallin by the police cruiser, Mallin's mother remained in the van with a police officer by her door.  (Theresa Mallin Dep. Pt. 1 at 64:8-16.) Viewing these facts in the light most favorable to Mallin, a reasonable jury could conclude that Mallin had been neutralized–and thus did not pose "an immediate threat" to his mother, the officers, or others–when Thompson allegedly slammed Mallin and choked him.  *See Graham*, 490 U.S. at 396.

The third factor similarly favors Mallin because there is no evidence that he "actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Id*. at 396.  To the contrary, as noted, Thompson testified that Mallin was "compliant" at all times in response to Thompson's directions to him.  (Doc. 27-2 at 2.)

The facts of this case are similar to those in *Minchella v. Bauman,* in which the Sixth Circuit reversed summary judgment for a police officer accused of using excessive force.  72 Fed. Appx. 405 (6th Cir. 2003).  There, the plaintiff claimed that she was grabbed, slammed into a police car, and kicked in the leg after she refused to be handcuffed and turned to walk away from the arresting officers. *Id*. at 408-09.  Despite that plaintiff's attempt to resist arrest, the Sixth Circuit held that there was a genuine issue of material fact as to whether the officer's actions were excessive.  *Id*. at 409-10.  The Sixth Circuit has also found genuine issues of material fact in other cases involving police slamming suspects against stationary objects.  *See Carpenter v. Bowling*, 276 Fed. Appx. 423, 425-428 (6th Cir. 2008) (suspect slammed against van despite not resisting arrest); *Burden v. Carroll*, 108 Fed. Appx. 291, 293-294 (6th Cir. 2004) (belligerent suspect slammed against brick wall after reportedly

22

threatening a third party); *Bass v Robinson*, 167 F.3d 1041, 1046 (6th Cir. 1999) (suspect's head slammed against tree after drug sting).

The resolution of this portion of Mallin's excessive force claim similarly turns on several genuine issues of material fact, including at a minimum: (1) whether Thompson slammed Mallin's face into the police cruiser and choked Mallin; and (2) whether Mallin posed "an immediate threat" when Thompson undertook these actions.  Consequently, Mallin has satisfied prong one of the *Saucier* test. *See Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997) (holding that when the plaintiff's evidence, viewed in the most favorable light, amounts to a constitutional violation, prong one of the *Saucier* test is satisfied even if the facts pertinent to the alleged constitutional violation are disputed).

### b. Injury

Thompson separately argues that there can be no constitutional violation because there is insufficient evidence of injury to Mallin resulting from Thompson's alleged use of force.[21]  Specifically, Thompson argues that Mallin's claim should fail because the record lacks "contemporaneous photographic or medical evidence" of Mallin's injuries. (Doc. 27 at 24).

As an initial matter, Thompson cites no case for the proposition that a plaintiff must provide contemporaneous medical evidence of injuries.  Indeed, contrary to Thompson's argument, the Sixth Circuit has made clear that a plaintiff may "allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage." *Morrison*, 583 F.3d at 407 (quotation omitted).  The relevant consideration is not the "extent of the injury inflicted" but, rather, whether an officer subjects a detainee to "gratuitous violence." *Id.* (*citing*

---

[21]The defendants appear to make this argument with respect to all of Mallin's claims of excessive force arising from his encounters with Thompson and Gonzales on February 2nd and 3rd of 2008.  The following analysis applies equally to the remainder of those claims.

23

*Pigram v. Chaudoin*, 199 Fed. App'x. 509, 513 (6th Cir. 2006) (denying qualified immunity to an officer who slapped an unruly suspect in the face despite the minimal use of force and the absence of any resulting injury)).

Despite having no obligation under the law of this Circuit to do so, Mallin has, in fact, provided medical evidence of his injuries. (*See* Doc. 35-1 ("Kousa Report").) Dr. Kousa, who examined Mallin both prior to and after the Officers' alleged use of excessive force, reported that Mallin now "suffers from neck pain on the left side, numbness and tingling traveling down to the left hand, weakness in the left upper extremity and seizures," which were not present before. (*Id*. at 1.) Dr. Kousa further concluded that "after taking history and conduction a physical exam and a medical evaluation, [he] had the impression" that Mallin "received an assault to his head, neck and the [sic] left shoulder." (*Id*.)[22] Contrary to Thompson's suggestion that Mallin was not injured, this medical evidence, which must be viewed in the light most favorable to Mallin, reveals that at some point prior to his evaluation by Dr. Kousa, Mallin received injuries that were non-trivial.

Thompson also claims that "after being transported to Lake County Jail, plaintiff complained to no one about any injuries he allegedly suffered while in Eastlake's custody." (Doc 36 at 6.) But this mischaracterizes the facts, at least as they appear in the light most favorable to Mallin. Mallin testified that he complained about his injuries as early as February 5, 2008, but his complaints were not recorded. (Mallin Dep. Pt. 2 at 23:9-12.)

In any event, Mallin alleges that Thompson slammed Mallin's head and choked him when he posed no threat to the officers or others, and was not a flight risk. Accordingly, Thompson's alleged conduct, if it occurred, represents "the sort of 'gratuitous violence'" which the Sixth Circuit has found

---

[22]The Court expresses no opinion as to the admissibility of this statement at trial.

24

"unreasonable under the Fourth Amendment, regardless of the existence of injury." *Morrison,* 583 F.3d at 407 (citations omitted).  Accordingly, the nature and extent of Mallin's injuries do not warrant judgment as a matter of law in favor of Thompson.

## 2. Violation of a Clearly Established Right

Thompson may still be entitled to qualified immunity if Mallin's right to be free from having his face slammed into a car and being choked was not clearly established at the time of the violation. *Saucier*, 533 U.S. at 201.  The dispositive inquiry is whether it would have been clear to a reasonable officer that Thompson's conduct was unlawful under the circumstances.  *Grawey*, 567 F.3d at 313-314. Based on this Circuit's decisions at the time of Thompson's conduct, it would have been clear to a reasonable officer that slamming Mallin's face into a car and choking Mallin was unlawful.  In the Sixth Circuit, "the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized."  *Alkhateeb v. Charter Township of Waterford*, 190 Fed. Appx. 443, 452 (6th Cir. 2006).  As noted above, taken in the light most favorable to Mallin, Thompson had neutralized Mallin prior to slamming his face and choking him.  With respect the specific act of slamming a suspect, Thompson was put on notice that slamming Mallin's face into a police car was unlawful by this Circuit's numerous decisions holding that the force alleged to have been used would be unreasonable where the suspect was slammed against a vehicle or other stationary object.  *See Minchella,* 72 Fed. Appx. at 409-10 (discussed above); *Bowling*, 276 Fed. Appx. at 425-428 (same); *Burden*, 108 Fed. Appx. at 293-294 (same); *Bass*, 167 F.3d at 1046 (same).  Consequently, Thompson's argument that the right at issue was not clearly established must be rejected.

In reaching the conclusion that Mallin may proceed with this claim, the Court acknowledges that Mallin's deposition testimony is at times inconsistent, both with itself and with his interrogatory

25

answers.[23]  It bears emphasis, however, that in "reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quotations omitted).  "[W]hen the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true," *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994), even when the non-movant's account is contradictory, *see Schreiber*, 596 F.3d at 332 (crediting plaintiff's testimony of instances of excessive force for summary-judgment purposes despite contradictions in his deposition testimony); *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) (same).  Similarly, while the Court recognizes that this conclusion is, indeed, dependent upon assumptions which are generous to Mallin, this Court is required to indulge them.  *Murray-Ruhl v. Passinault*, 246 Fed. Appx. 338, 343 (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 216) (holding that a district court should not grant immunity if "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury").

---

[23]For instance, and as Thompson emphasizes, Mallin initially claimed in an interrogatory answer that Thompson put handcuffs on Mallin "right away," before slamming Mallin's face on the police car.  Mallin contradicted this account during his deposition, claiming that Thompson handcuffed Mallin *after* slamming Mallin:

Q. Do you realize In your Interrogatory Answer you said that, "Officer Thompson dragged me from the vehicle, my arm caught on the seat belt. He put cuffs on me right away. He slammed my face down on the police car and said I was under arrest for domestic violence." So my question is, which is it, James, did he slam your face down on the car before he put the cuffs on you or after?

A. Before.

Q. So you want to change your answer today?

A. Yeah.

(Mallin Dep. Pt. 1 at 77:21-78:10.)

26

For these reasons, the Court finds that neither prong of the *Saucier* inquiry can be decided as a matter of law and Thompson's request for qualified immunity as a matter of law must be denied with respect to this instance of excessive force.

### B. Thompson's Use of Excessive Force During Mallin's Booking on February 2, 2008

Mallin also claims that Thompson used excessive force during Mallin's booking process when Officer Thompson punched Mallin in the head.  Though Mallin cannot remember the events immediately following his arrest, (Mallin Dep. Pt. 1 at 66:4-9.), when asked about the next thing he does remember, Mallin stated:

> Waking up in the booking room. I asked what was going on. I took the phone out of my pocket. I called my mom to see what was going on. Next thing I know the doors come flying open, cop runs up to me, Mr. Thompson, and asked me if I like beating up on old ladies. I had the phone in this ear, punched me in the side of the head. My phone went flying. And next thing I know, I woke up in the jail cell.[24]

(*Id*. at 66:10-18.)  When asked whether he was aware that Thompson was in the interview room with Mallin's mother, Mallin reiterated:

> He's the one that came in and punched me in the side of the head. I know that for a fact because I looked right at him when he came through the door. He's got a bald head, I can't forget him. I've had to deal with him ever since then.

(*Id*. at 67:9-13.)

### 1. Fourth Amendment Violation

Because the alleged use of excessive force occurred before Mallin's probable-cause hearing, this claim must be analyzed under the Fourth Amendment objective reasonableness standard.  *See Aldini*, 609 F.3d at 864.  Though Mallin was not handcuffed when Thompson allegedly punched him, nothing

---

[24]As noted above, this is contradicted by Mallin's later deposition testimony.  *See supra* n.5 & n.6.

27

suggests that he posed an immediate risk of harm to Officers Maloney and Werner, who were with him in the booking room.  *See Graham*, 490 U.S. at 396.  Nor did he pose such a risk to either his mother or Thompson.  According to Mallin, he called his mother merely to ask her "what was going on." (Mallin Dep. Pt. 1 at 66:11-12.)  Mallin's mother testified that Mallin asked where she was and told her that he wanted to go home.  (Theresa Mallin Dep. Pt. 2 at 4:12-16.)  Though she testified that his voice was "louder," she claims that he was not yelling or "saying mean things."  (*Id*. at 17-22.)  At no point does anyone claim that Mallin threaten his mother or the officers.  Similarly, there is no evidence that Mallin attempted to flee.  *See Graham*, 490 U.S. at 396.  In addition, a jury could conclude that Thompson's rhetorical question about whether Mallin enjoyed "beating up on old ladies" shows that the purpose of the punch "was not to subdue Mallin, but rather to punish him." *Baker*, 471 F.3d at 607. Consequently, when viewed in the light most favorable to Mallin, the facts show that Thompson punched Mallin, despite Mallin posing no safety or flight risk.  In light of these circumstances, Thompson's alleged use of violent force was gratuitous and therefore unreasonable. *See Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) (holding that in the Sixth Circuit there is undoubtably "a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others."  (collecting pre-February 2008 cases)

Thompson's sole argument against finding a constitutional violation is that the plaintiff cannot be trusted.  Instead of accepting Mallin's direct evidence as true, as is required at this juncture, Thompson argues that "plaintiff's version cannot be determined to be genuine as Sgt. Maloney and Ptl. Werner were behind the booking desk, and observed plaintiff on the Booking Room phone" and not, as Mallin claims, on his cell phone. (Doc. 27 at 15.)  Thompson further claims that Mallin did not even

28

have a cell phone with him that night, citing Mallin's Booking System Inmates Property form ("Property Form"), (Doc. 29-11 at 3). He also faults Mallin for failing to provide cell phone statements showing his calls from that night. While all of what Thompson says may be true, Thompson's attempt to impeach Mallin using these factual disputes highlights the flaw in his argument: rather than demonstrate that there are no genuine material fact disputes, as is his burden, Thompson essentially asks this Court to resolve any such disputes in his favor by finding that Mallin's testimony is not credible. On summary judgment, however, this Court is strictly prohibited from undertaking such "credibility judgments and weighing of the evidence." *Biegas*, 573 at 374.

This case, moreover, is not one in which the plaintiff's facts are so "blatantly contradicted by the record" that no reasonable jury could believe it, as Thompson contends. *Scott*, 550 U.S. at 381. In *Scott*, the Supreme Court considered whether Timothy Scott, a police officer, was entitled to qualified immunity from a § 1983 suit alleging use of excessive force in stopping Victor Harris, a fleeing motorist. *Id*. at 375. At the outset, the Court noted the familiar requirement that, when parties tell different stories, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing" summary judgment." *Id*. at 378 ("In qualified immunity cases, this usually means adopting...the plaintiff's version of the facts."). The Court identified, however, "an added wrinkle" in the case: the "existence in the record of a videotape capturing the events in question." *Id*. This videotape–which was not alleged to have been altered in any way, or to otherwise depict something different than what actually happened–"quite clearly contradict[ed]" the plaintiff's version of the facts. *Id*. At 381. Thus, in addressing the dispositive fact issue of whether Harris was "driving in such fashion as to endanger human life, the Court held that, because Harris's version of events "is so utterly discredited" by the video, the facts should have been viewed "in the light depicted by the

videotape." *Id.* at 380.

　　While there are many reasons on the current record to doubt Mallin's version of the events–not the least of which are the fact that he was apparently intoxicated at the time and has lapses in his recollection of the evening's happenings–there is no undisputed "added wrinkle" akin to the videotape in *Scott* that should supercede Mallin's account. *Cf. Marvin v. City of Taylor*, 509 F.3d 234, 239 (6th Cir. Mich. 2007) ("Ordinarily, in a qualified immunity case such as this, the Court would simply adopt the plaintiff's version of the facts. However, the existence in the record of a videotape capturing the events in question provides an 'added wrinkle' to the ordinary situation.") (citation omitted).  The affidavits of Maloney and Werner, prepared by the Defendants' attorneys, merely contain the ordinary after-the-fact testimony of a defendant's witnesses.  This Court must leave it to the jury to decide who among the officers and Mallin to believe. *Biegas*, 573 at 374.

　　With respect to the cell phone records, it is true that records showing that Mallin called his mother at the time in question would bolster Mallin's case by corroborating his account.  But that evidence goes only to credibility, not, as did the videotape in *Scott*, to resolving a remaining material fact dispute. *See Scott*, 550 U.S. at 380.  As documentary evidence, the Booking System Inmates Property form most closely resembles the videotape in *Scott*.  There are, however, several key differences.  Before deciding to view the facts "in the light depicted by the videotape," the Court emphasized that its accuracy had never been challenged. *Scott*, 550 U.S. at 378 ("There are no allegations or indications that this videotape  was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.") The videotape's undisputed accuracy allowed the Court to view the facts "in the light depicted by the videotape." *Id.* at 380.  In stark contrast to the situation in *Scott*, Mallin vigorously disputes the accuracy of the Property Form.  (Mallin Dep. Pt. 2 at

30

35.)[25]  Accordingly, a reasonable jury could conclude that Mallin had his cell phone and that the booking officers failed to describe accurately his possessions.

Even if this Court were to view the facts in light of the Property Form, rather than on the basis of Mallin's testimony, the outcome would not change.  In *Scott*, the videotape captured the sequence of events leading up to and including the alleged use of excessive force, resolving a fact issue central to the objective reasonableness inquiry: whether Harris's driving was sufficiently dangerous to justify the use of deadly force.  *See Scott*, 550 U.S. at 380.  With that factual issue resolved in Scott's favor as a matter of law, the Supreme Court could rule that Scott was entitled to qualified immunity.  In contrast, even if this Court were to reject Mallin's assertion that he called from his cell phone, a disputed genuine material fact issue remains–namely, whether Thompson punched Mallin while on some other phone.

_____

[25]When asked about the Property Form, Mallin testified:

A. When it says about my property, the cell phone was in there and they didn't list it.

Q. I guess, James, the whole point is, do you expect us to believe you've been placed in custody, you've been patted down and they let you keep your cell phone when you were in the booking room?

A. I don't care what you believe. I was there, you weren't. Get the tapes.

Q. I'm asking if that's what you expect me to believe?

A. Yeah. It's the truth. I'm not going to sit here and lie about it, and waste somebody else's time.

...

Q. If I get your Revol phone records, it will show you made a cell phone call?

A. Yeah, go ahead.

...

Q. But there's no listing of it being in your property anywhere?

A. No, there's not. Should have been because I did have it.

31

While proof that Mallin used the booking phone would certainly be relevant to Mallin's *credibility*, it is not otherwise relevant to the objective reasonableness inquiry.

Because Mallin's version of the facts rises to a Fourth Amendment violation, he has satisfied the first prong of *Saucier*. *See Turner*, 119 F.3d at 428.

### 2. Violation of a Clearly Established Right

The next inquiry is whether Mallin's right to be free from Thompson's alleged Booking Room punch was clearly established at the time of the incident. *See Saucier*, 533 U.S. at 201. This Court concludes that it was. Under the Sixth Circuit's case law as of February 2008, there was undoubtably "a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." *Harris,*, 583 F.3d at 367 (collecting pre-February 2008 cases); *Grawey*, 567 F.3d at 313-314 (same). Based on this Circuit's ample case law establishing a non-dangerous suspect's right to be free from violent physical force, Thompson had "fair warning" that his actions were unconstitutional. *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) ("[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional.") (quotation omitted). Because Thompson had fair warning that punching Mallin was unconstitutional under the circumstances, he is not entitled to qualified immunity from this claim.

### C. The Officers' Use of Excessive Force in Mallin's Cell on February 3, 2008

Mallin further claims that Officers Thompson and Gonzales used excessive force while removing Mallin's clothing after Mallin's failed attempt to hang himself in his jail cell. Specifically, Mallin claims that Gonzales had his foot on Mallin's throat and neck, apparently to hold Mallin down

while the officers removed his clothing.  (*Id*. at 16:5-14, 17:19-21.)  When asked about Thompson's involvement, Mallin alleged only that Thompson held Mallin down and removed his shirt.  (*Id*. at 17:24-25 ("Q. And what was Thompson doing at the time? A. Holding me down taking my shirt off.")  For reasons articulated below, a reasonable jury could only conclude from these sparse facts that both officers are protected by qualified immunity.

### 1. Officer Thompson's Use of Force

With respect to Thompson's alleged use of force, Mallin claims only that Thompson held Mallin down and took off Mallin's shirt.[26]  Mallin did not produce any evidence regarding the means by which Thompson held him down and took off his shirt, nor did Mallin introduce facts regarding the degree of force that Thompson used.  Without such facts, it would be impossible for a jury to conclude that Thompson's actions were objectively unreasonable under the circumstances.  Having observed that Mallin had attempted to hang himself with his own clothing (Gonzales Afft. at 2), the officers, following the Eastlake Police Department Jail Medical Policy, reasonably decided to remove Mallin's outer clothing to prevent Mallin from further attempts to harm himself.  (*Id*.)  Under these circumstances, the government's interest in averting another suicide attempt justify the use of some amount of restraint to remove a detainee's outer clothing.  *See Morrison,* 583 F.3d at 404 (holding that a central inquiry of the objective reasonableness standard is "whether the law enforcement officer had a legitimate government interest, i.e., justification, to exert force").  Even under such circumstances, of course, an officer's used of force could cross the threshold between reasonable and excessive force. Mallin, however, has failed to provide sufficient facts for a reasonable jury to conclude that Thompson,

---

[26]Though Thompson claims that he was no longer at the police department at the time of this incident (Doc. 27-2 at 2-3), the Court must adopt Mallin's version of the facts for the purpose of ruling on Thompson's motion for summary judgment.

if present, breached that threshold.  *See* Fed. R. Civ. P. 56(e)(2) ("[The non-moving party] may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."). Consequently, Thompson is entitled to qualified immunity from Mallin's claim of excessive force arising from the events in Mallin's jail cell.

### 2. Officer Gonzales's Use of Force

Mallin claims that, while removing Mallin's clothing, Gonzales put his foot on Mallin's throat and neck:

Q. Did Gonzales hit you?

A. In the Jail cell.  He held me down when they took my cloth [sic] off.  They had their

foot [sic] against my neck and my shoulders and everything else.

...

Q. Who had his foot on your throat?

A. Gonzales.

...

Q. So you now claim that Gonzales put his foot on your neck while they stripped your

clothes off, right?

A. Yeah.

(Mallin Dep. Pt. 2 at 16:5-8, 13-14; 17:19-21.)[27]

_____

[27]In his memorandum opposing the Defendant's Motion for Summary Judgment, Mallin also claims that officers "stomped [his] fingers and also punched [him] in the head and neck." (Doc. 35 at 6.)  Though plaintiff cites his deposition testimony for this quotation, the quoted language does not appear anywhere in Mallin's deposition transcript.  Indeed, the above quotation appears only in Mallin's Answer to Interrogatory #12, which was never filed with the Court. When asked, during his deposition, whether Gonzales hit him, Mallin testified only that Gonzales had his foot on

Though these facts present a Fourth Amendment inquiry similar to Thompson's, Mallin's allegations regarding Gonzales's feet on his neck and throat make the constitutional question a closer call. The Court, however, need not resolve that issue because Mallin has failed to show that, taking Mallin's facts as true, Gonzales's conduct violated clearly established law. *See Pearson*, 129 S. Ct. at 818. Accordingly, Gonzales is entitled to qualified immunity as a matter of law, even if his conduct was unconstitutional. *See Chappell*, 585 F.3d at 907.

In determining whether Mallin's right to be free from Gonzales's actions was clearly established–assuming that Mallin had such a right[28]–the fundamental inquiry is whether Gonzales had fair notice that his actions were unconstitutional "in the light of pre-existing law." *Champion*, 380 F.3d at 902. Accordingly, Mallin was required to "show the prior articulation of a prohibition against the type of excess force exerted here." *Id*. Mallin, however, has identified no case establishing the right of a detainee who just attempted suicide to be free from an officer's restraint while that officer attempts to prevent a future suicide attempt by removing the detainee's clothing. Though "there need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts," Mallin failed to cite a single case which would have put Gonzales on notice that his alleged actions were unlawful.

Gonzales's alleged conduct, moreover, falls well outside of the realm of cases involving the "clearly established legal norm precluding the use of violent physical force against a criminal suspect

_____

Mallin's throat and neck, mentioning nothing about being punched. (*See* Mallin Dep. Pt. 2 at 16:5-17:21.) Because Mallin's allegations of being punched are not part of the record, they cannot be considered for the purpose of ruling on the instant motion.

[28]Because the Court finds that Gonzales is entitled to qualified immunity even if his conduct violated the Fourth Amendment, *see Chappell*, 585 F.3d at 907, the following analysis assumes, without deciding, that Gonzales's actions were unconstitutional.

who already has been subdued and does not present a danger to himself or others." *Harris*, 583 F.3d at 367.  As an initial matter, unlike the suspect in *Harris*, Mallin posed a great risk of harm to himself–a harm which Gonzales sought to neutralize by removing Mallin's outer clothing.  Indeed, when Gonzales arrived at Mallin's cell, Mallin had just attempted to hang himself with his own clothing and Gonzales had to untie Mallin from his makeshift noose.  (Gonzales Afft. at 3.)  As an additional distinction, while Mallin may have preferred to have been restrained by another part of his body, there is no evidence in the record indicating that Gonzales's restraint was violent; Mallin alleges only that Gonzales put his foot on Mallin's neck and throat, not that he kicked or stomped Mallin, or even applied undue pressure while doing so.  The clearly established legal norm prohibiting "violent physical force" against a subdued criminal suspect, who poses no danger to himself, is thus inapplicable to Gonzales's alleged conduct.  *Cf. id*.

Because Mallin failed to carry his burden of proving that a reasonable officer should have known that Gonzales's actions violated a clearly established right, the Court must grant Gonzales qualified immunity as a matter of law.  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) ("Qualified immunity must be granted if the plaintiff cannot establish each of [the *Saucier*] elements.").[29]

### D. Thompson's Use of Excessive Force While Arresting Mallin on February 16, 2008

Mallin claims that Thompson again used excessive force while arresting Mallin at his sister's house.  In assessing the reasonableness of Thompson's actions, we analyze the events in segments.

_____

[29]Mallin makes no claim that the removal of his clothing violated any constitutional right under the circumstances; he only objects to the *manner* in which they were removed.  (*See* Compl. at ¶ 3) (alleging only that Thompson and Gonzales used *excessive force* at the Eastlake Police Department, not that they were deliberately indifferent to serious medical needs, or that they otherwise violated the constitution, by removing his clothing).

36

*Phelps*, 286 F.3d at 301.  There are two segments: 1) the incident in the upstairs bedroom when Thompson allegedly pulled Mallin out of bed by Mallin's neck; and 2) the incident downstairs where Thompson picked Mallin up from the couch. Considering the relevant factors, with respect to both of these segments, even Mallin's own version of the events supports a finding that Thompson is entitled to qualified immunity.

### 1. Thompson's Use of Excessive Force in the Upstairs Bedroom

With respect to the first incident, Mallin testified:

I was in bed. Next thing I know the door comes flying open, good morning, Mr. Mallin, it's time to get up. Officer Thompson comes over and grabs me by the neck, grabs me out of bed.

(Mallin Dep. Pt. 2 at 17-20.) Despite Mallin's ability to recall Thompson's greeting, Mallin claims that he cannot remember how long Thompson applied pressure to his neck because he was awakened "out of a dead sleep."  (*Id*. at 91.)  Mallin did concede, however, that he got to a standing position "immediate[ly]" (*id*. at 11:6-7) and that Thompson applied no downward pressure on Mallin's neck (*id*. at 11:8-14).

Even if it were to accept Mallin's account as true, a reasonable jury could not conclude that Thompson's use of force violated the Fourth Amendment. Thompson was at the house that morning to arrest Mallin for violating a protective order earlier that day.  Based on Mallin's own testimony that he was in a "dead sleep," a reasonable officer could find it necessary to use some amount of physical coercion to awaken Mallin.  Officer Thompson testified that he used only "minimal verbal and physical force to awaken" Mallin. (Doc. 27.2.) Mallin does not expressly dispute this characterization. Mallin's testimony reveals, moreover, that the force used was moderate, at most.  It is undisputed that Thompson applied no downward pressure.  That Mallin allegedly got to a standing position immediately, moreover,

coupled with the absence of any evidence that Thompson used force for a purpose other than getting Mallin out of bed, indicates that Thompson used force only to the extent necessary, rather than gratuitously.  Thompson's alleged actions are thus far afield from those in cases finding excessive force where "[g]ratuitous violence" is "inflicted upon an incapacitated detainee." *Morrison*, 583 F.3d at 407.

As the non-movant, Mallin had the burden to put forth "specific facts" showing a genuine dispute regarding whether Thompson's use of force was objectively unreasonable.  *See* Fed. R. Civ. P. 56(e)(2).  Mallin, however, testified that he could not recall facts bearing on the amount of force Thompson used, such as how long Thompson applied pressure, because he was not fully conscious at the time.  (*See* Mallin Dep. Pt. 2 at 11:1-3.)  And though Mallin testified that Officer Roberts was present during the incident (*Id*. at 11:17-19), Mallin sought no discovery from Roberts.  As a result, no reasonable jury viewing the evidence in the light most favorable to Mallin could find that Thompson's conduct in the bedroom violated the Fourth Amendment.  Consequently, Thompson is entitled to qualified immunity from this claim as a matter of law.

### 2. Thompson's Use of Excessive Force Downstairs

Mallin also claims that Thompson used excessive force when he picked Mallin up from a couch. Mallin claims that, because Thompson thought Mallin was dressing too slowly, Thompson picked Mallin up by his shoulders.  (Mallin Dep. Pt. 2 at 10:4-6 ("I wasn't tying my shoes quick enough.  He grabbed me by my shoulders and said hurry up."); 13:18-25 ("Picked me up by my shoulders".)  When asked, in his deposition, whether this maneuver further injured him, Mallin responded:

A. I believe so, yeah.

Q. How?

A. My shoulders, because my shoulder from them beating my ass in lock up.

38

(*Id*. at 14:17-20.)

Even when viewed in the light most favorable to Mallin, these facts fail to rise to a Fourth Amendment violation.  In his deposition testimony, Mallin concedes that he had "about 10 minutes" to finish getting dressed and put on his shoes.  (*Id*. at 13:10-14.)  Mallin claims, however, that when Thompson returned, Mallin had yet to put on his shoes because he was "sitting there talking" and "smoking a cigarette."  (*Id*. at 13:16-17.)  Based on Mallin's account, a reasonable officer could conclude that Mallin was stalling and that the modest force involved in the non-invasive maneuver of picking Mallin up by his shoulders was warranted.  Notably, Mallin makes no claims about the degree of force with which Thompson picked him up, nor does he claim that Thompson was violent or aggressive.  Though Mallin claims he was injured as a result of Thompson's picking him up by the shoulders, Mallin claims that the injury resulted because his shoulders had already been injured when he was beat up in jail.  (*Id*. at 14:19-20.)  If Mallin had warned Thompson that his shoulders were already injured, Thompson's actions arguably may have been gratuitous.  Mallin, however, never claimed to have given Thompson such a warning.

As the facts currently stand, Mallin has made no more than a bald allegation that Thompson's use of force in picking Mallin up off the couch was excessive.  Because Mallin failed to set forth "specific facts" showing a genuine dispute regarding whether Thompson's use of force reached the level of a Fourth Amendment violation, Thompson is entitled to qualified immunity as a matter of law with respect to this segment.  *See* Fed. R. Civ. P. 56(e)(2).

## VI.     WHETHER THE CITY OF EASTLAKE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

The City of Eastlake argues that it is entitled to judgment as a matter of law because Mallin has

failed to identify a specific policy or practice that was the "moving force" of the alleged constitutional violation, as required by *Monell v. Department of Social Services*, 436 U.S. 658, 694.  Not only has Mallin failed to identify a specific policy or practice, but he failed to even address this claim in his opposition brief.  *See* (Doc. 35.)  Because Mallin has not "set out specific facts showing a genuine issue for trial," on this issue, Fed. R. Civ. P. 56(e)(2), the City of Eastlake's Motion for Summary Judgment with respect to Mallin's § 1983 claim is **GRANTED**.

### VII.    DISMISSAL OF THE PLAINTIFF'S STATE LAW CLAIMS

The Defendants have also moved for the dismissal of Mallin's state law claims in the event that summary judgment is entered in the Defendants' favor with respect to Mallin's federal claims.  Because summary judgment was not entered in Thompson's favor with respect to Mallin's federal claims, the Court finds the Defendants' Motion to be **MOOT** as to Thompson.  Because no federal claims remain against Gonzales, the Court declines to retain jurisdiction over the remaining state law claims against him.  Accordingly, Gonzales's Motion for Dismissal of Plaintiff's State Law Claims is **GRANTED** and Mallin's state law claims against Gonzales are therefore **DISMISSED**.  With respect to the City of Eastlake, Mallin's only federal claim has been adjudicated as a matter of law in the City's favor.  The only remaining claim against the City is Mallin's state law claim for intentional infliction of emotional distress.  Because the set of facts giving rise to this claim, however, are the same as those giving rise to Mallin's intentional infliction of emotional distress claim against Thompson, whose federal claims remain, the Court, in the interest of judicial economy, will retain jurisdiction over this claim as to the City.  The City's motion for dismissal of Mallin's state law claims is therefore **DENIED**.

40

## VIII.   SUMMARY JUDGMENT FOR THE CITY ON THE ISSUE OF STATE LAW

### IMMUNITY

Though the City did not move for summary judgment that it is entitled to immunity from Mallin's state law claims, the Court raises the issue *sua sponte.*  Mallin asserts only the intentional infliction of emotional distress against the City.  (Compl. at ¶¶ 13-15.)  The City appears to be absolutely immune from such a claim under Ohio law, which provides in relevant part:

> Except as provided [below], a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function. . . .
> (B)
> (1) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees . . . .
>
> (2) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.
>
> (3) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads. . . .
>
> (4) [P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function . . . .
>
> (5) [A] political subdivision is liable for injury, death, or loss to person or property when civil  liability is expressly imposed upon the political subdivision by a section of the Revised Code....

O.R.C. § 2744.02(A)(1) & (B)(1-5).  Accordingly, the City could only be liable if some section of the Revised Code expressly imposes liability upon it, as none of the other bases for immunity could apply: this action does not involve a motor vehicle (see O.R.C. § 2744.02 (B)(1)), proprietary function (see

41

O.R.C. § 2744.02 (B)(2)),  public road (see O.R.C. § 2744.02 (B)(3)), or public building (see O.R.C. § 2744.02 (B)(4)).  Because it appears that no such section expressly imposes liability on the City, the Court **ORDERS** Mallin to show cause as to why the City is not immune from his  intentional infliction of emotional distress claim within 14 days.  If Mallin fails to timely show cause, summary judgement shall be **GRANTED** in favor of the City on the issue of state law immunity.

## VIIII.  CONCLUSION

With respect to the Defendants' summary judgment motions, the very narrow question before the Court now is whether, on the record before it, there are genuine disputes of material fact that prevent judgment in the Defendants' favor on their claim of qualified immunity and require further inquiry before a jury.  While the Court acknowledges that Mallin's testimony is at times inconsistent, his testimony is not so "blatantly contradicted by the record" that no reasonable jury could believe it. Because Mallin has presented "direct evidence refuting the [Defendants'] motion for summary judgment," this Court "must accept that evidence as true," *Adams*, 31 F.3d at 382, even when Mallin's account is contradictory, *Schreiber*, 596 F.3d at 332. *See also*, *Biegas*, 573 F.3d at 374 ("In "reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.") (quotations omitted); *Murray-Ruhl*, 246 Fed. Appx. at 343 (holding that immunity should not be granted if "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury").  When taken as true, Mallin's evidence reveals that numerous genuine material fact disputes remain regarding the reasonableness of Officer Thompson's use of force on February 2, 2008.  It is this reservoir of disputed facts which, at least under current, binding Sixth Circuit precedent, counsels

42

against a judgment granting qualified immunity to Thompson at this stage of the proceedings with respect to Mallin's first two claims of excessive force.[30]

Accordingly, for the foregoing reasons, the Court concludes that Officer Thompson's motion for summary judgment based on qualified immunity from Mallin's excessive force claim under § 1983 is **DENIED** as to Mallin's first two claims of excessive force.  Thompson's motion is **GRANTED**, however, as to Mallin's claims that Thompson used excessive force in Mallin's jail cell on February 3, 2008 and during Mallin's arrest on February 16, 2008.  Officer Gonzales's motion for summary judgment based on qualified immunity is **GRANTED**.  The City of Eastlake's motion for summary judgment is **GRANTED**.  The Defendants' dependent motion for dismissal of Mallin's state law claims is **DENIED** as to Thompson and the City but is **GRANTED** as to Gonzales.  The Court **ORDERS** Mallin to show cause as to why summary judgement should not be granted in favor of the City on the issue of state law immunity.  If Mallin fails to timely show cause, summary judgement shall be **GRANTED** in favor of the City on this issue.

**IT IS SO ORDERED.**

*s/ Kathleen M. O'Malley*
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 29, 2010**

---

[30]Because this determination turns on disputed issues of fact, rather than on any legal question, Thompson is not entitled to take an interlocutory appeal from this order. *Johnson v. Jones*, 515 U.S. 304, 319-320 (1995) ("[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."); *Brown v. Metcalf*, 366 Fed. Appx. 621, 623 (6th Cir. 2010) ("[W]e do not have jurisdiction to entertain such an appeal because it turns on a disputed factual issue, not on an issue of law.").